NOTICE

Decision filed 03/08/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180524-U

NO. 5-18-0524

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 17-CF-213 |
| | ) | |
| KENTARO MISUDA, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Because a rational jury could have found beyond a reasonable doubt the essential elements of the crime of custodial sexual misconduct based upon the evidence presented in this case, the defendant's sufficiency of the evidence claim fails, and because the defendant concedes that his second contention of error is unsustainable in light of new controlling precedent from the Illinois Supreme Court with regard to that contention of error, we affirm the defendant's conviction and sentence.

¶ 2    The defendant, Kentaro Misuda, appeals his conviction and sentence after a jury trial in the circuit court of Jackson County in which he was found guilty of one count of the Class 3 felony of custodial sexual misconduct and subsequently was sentenced to conditional discharge for a period of 30 months and to pay fines, costs, and surcharges in the amount of $3000. He also was ordered to obtain a mental health evaluation and to successfully complete any recommended treatment. For the following reasons, we affirm the defendant's conviction and sentence.

1

¶ 3                                I. BACKGROUND

¶ 4      On May 10, 2017, the defendant was indicted on one count of custodial sexual misconduct. The indictment alleged that "on or about April 6 or 7, 2017," the defendant, while employed at the Jackson County jail, "knowingly engaged in sexual penetration with" the victim, who was then in the custody of the jail. A subsequent disclosure from the State, filed on July 27, 2018, stated that "[t]he exact time and date of the occurrence cannot be determined," but that "[t]he act of sexual penetration is that of oral sex[,] in that the defendant's penis made contact with the mouth of [the victim,] an inmate of the Jackson County Jail."

¶ 5      On August 1, 2018, testimony began in the defendant's jury trial. The first witness to testify was Erica Hunter. Hunter testified that she was employed as a correctional officer in the jail division of the Jackson County Sheriff's Office, and that one of her duties was to serve as a PREA officer, which she explained referred to a federal law and meant that she was a Prison Rape Elimination Act officer. She knew the defendant from the defendant's work as a correctional officer at the jail and his work as a PREA compliance manager. Hunter testified that PREA officer duties included the duty to "keep the inmates safe and secure," which included the duty to "keep them from any sexual harassment, sexual abuse or sexual assault that came about[,] being from an inmate on inmate contact or a staff on inmate." She testified that staff members were not allowed to have any type of relationship with inmates, something that she impressed upon other jail staff, and "very much" impressed upon inmates. She testified about general jail procedures that correctional officers were required to follow, including a rule that after the jail was locked down for the night at 11 p.m., officers were not allowed to open any cell doors unless there was an emergency and the officer was accompanied by another officer. She testified that food, medicine, or blankets that were required during lockdown hours could be passed through a rectangular "food port" in the cell, so officers did not need to open cell doors.

2

¶ 6    Hunter testified that on April 24, 2017, while she was on duty and in her capacity as a PREA officer, she received a PREA complaint from female inmates Sharon Sargent and Britney Davis, to the effect that they believed sexual contact had taken place at the jail between the defendant and a woman who was previously an inmate at the jail, at a time when the woman was an inmate. Hunter testified that Sargent and Davis were housed together in a cell that was in the same cellblock as the former inmate, but a floor below the former inmate's cell. Hunter testified that a "plumbing chase" connected the cells in the cellblock, and that vents allowed "airflow to and from the plumbing chase into the cell unit." She described the acoustics of the cellblock as "very loud," which she testified meant that "when they talk you can hear them outside the cell," and that when people talk in the cell, "you can hear it below everywhere because there's no padding in that room to absorb any of the sound." She testified that the former inmate had been housed in the jail on Union County, rather than Jackson County, charges, and that on April 7, 2017, the former inmate was transferred to a facility of the Illinois Department of Corrections (IDOC). Hunter testified that she "sat in on" an interview that subsequently was conducted with the former inmate at the IDOC facility by an Illinois State Police investigator, and that she learned that the defendant had visited the former inmate at the IDOC facility after she was sent there. Hunter testified that she viewed IDOC records that substantiated the defendant's four visits—on the 16th, 17th, 24th, and 25th days of April 2017—to the IDOC facility to visit the former inmate.

¶ 7    On cross-examination, Hunter agreed that Sargent would not have been able to see from her cell into the cell of the former inmate. She also agreed that the former inmate was not in the cell directly over Sargent's cell, but was one cell over from that cell, and that Sargent did not report the alleged sexual activity immediately, but only did so when Sargent was "in trouble" and in lockdown for possessing a pencil sharpener in her cell. Hunter agreed that the former inmate

3

seemed surprised to see Hunter at the IDOC facility, and that during the interview there, the former inmate first denied, but then admitted, that the sexual incident took place.

¶ 8    The next witness to testify was Sharon Sargent, who testified that she was 60 years old and was presently incarcerated in IDOC following a 2017 Union County conviction for "[p]roduction, manufacturing of methamphetamines." She testified that she was in the Jackson County jail in April 2017 and knew both the defendant and the former inmate. She described the relationship between the defendant and the former inmate, testifying that the defendant "was spending a lot of time with her, like at the chuckhole he would spend a whole lot of time with her there and at med line, he would spend time with her then." She also testified that the defendant "would spend time with her after lockdown at night," adding that she "could hear them through the sink in [her] room." When asked how well Sargent could hear "what was going on in the cells around" her, Sargent testified, "The cells above and the cells next to me, I could hear very well because the plumbing device was hollow, and I could hear relatively really well to the talking and other things that were going on in the room." When asked what kind of sounds she heard coming from the cell of the former inmate, Sargent testified, "there was noises coming from her cell as to like moaning and groaning noises, talking with a male officer or a male person, just a male person." She characterized the sounds as "sexual sounds," adding "[l]ike noises one would make when they are sexually aroused." She testified that she "heard the sound of two people," and that she knew who the other person was. When asked how she could identify the other person, Sargent testified that she "knew who the officer was because [she] saw him go up the stairwell" that was within her view. Sargent testified that the defendant treated the former inmate "totally different than others" and allowed her certain favors and privileges that other inmates did not get. She testified that she did not report the favoritism, or the alleged sexual relationship, at the time "[b]ecause there was no privacy as to how I could notify another officer, plus [the defendant] was a PREA officer at the

4

time." She testified that she subsequently notified another correctional officer because she "felt at the time what I had seen was wrong and that I really didn't want this to happen to anybody else," and that she felt comfortable with the female correctional officer to whom she reported it.

¶ 9    On cross-examination, Sargent testified that although she was in lockdown status when she reported the alleged sexual activity, she did not receive any special treatment for making the report, did not get out of lockdown status, and did not get leniency on her eventual prison sentence on her Union County charges. She testified that she was not angry with the defendant when she reported the alleged sexual activity, and was not "jealous" of the special attention and favoritism the defendant showed to the former inmate. She agreed that she could not see into the cell of the former inmate, and agreed that she never saw the alleged sexual activity take place. On recross-examination, she agreed that she had let the former inmate use Sargent's phone time so that the former inmate could have phone conversations with the defendant without other correctional officers "listen[ing] in."

¶ 10    The next witness to testify was the former inmate. She testified that at the time of the trial, she was 24 years old and lived with her grandmother in Anna, Illinois. She testified that she was working on obtaining her GED certificate, as well as taking "drug and alcohol classes." She testified that she had drug and alcohol problems after the death of her father, with whom she was close, and that her drug addiction led to her stint in the Jackson County jail, and later the IDOC facility. She testified as to her prior drug-related convictions, and that she had served her sentences. She testified that she first met the defendant—whom she called "Boss" when she interacted with him—when she was incarcerated at the Jackson County jail in August 2016, and that they had a "[f]riendly" relationship at that time, which included talking about "just life, you know, how each other's days were." She testified that she was 22 years old at that time, and that no physical contact with him took place during her first stay at the jail or immediately thereafter.

¶ 11    The former inmate testified that she was again incarcerated at the jail beginning in February 2017 and concluding on April 7, 2017, when she was transferred to the IDOC facility. She testified that during this stint at the jail, she continued to talk with the defendant, and that eventually they had a "relationship." She testified that the relationship involved physical contact, which she testified was "[o]ral sex." She agreed that this meant that her mouth made contact with the defendant's penis. She testified that this took place while she was on the floor of her cell and the defendant was standing outside her cell, with the cell door open. She testified that the defendant's uniform pants remained on, but that he "unbuttoned his pants" to expose his penis. She testified that it took place for "[m]aybe a couple of minutes," and that the defendant ejaculated.

¶ 12    When asked to "describe sort of the progression that the relationship took from just talking to engaging in a sex act," the former inmate testified that she and the defendant wrote letters to each other, explaining that they "passed them back and forth to one another whenever the shift started," and that the defendant always collected the letters and kept them. With regard to the oral sex, she testified that it happened "[a] couple [of] nights before" she was transferred to the IDOC facility. She testified that she did not have a cellmate at the time, and that on other occasions as well—beginning about "a week" after she arrived at the jail in February—the defendant would come to her cell after lockdown hours, open her cell door, and they would talk. She agreed that the defendant showed favoritism to her over other inmates, and that they sometimes talked on the phone when he was off duty. She testified that after she was transferred to the IDOC facility, the defendant called her, sent letters, and visited her there. He also sent her "money, notebooks and stuff I needed." She testified that she and the defendant talked about being together after she was released. She testified that while she was incarcerated in the Jackson County jail, the defendant told her not to tell anyone about their relationship, because they both could get in trouble. When asked how she felt about the relationship she had with the defendant at the jail, she testified that it

6

was "beneficial," explaining, "I mean, I didn't have a lot of people there for me, so he was there at the time whenever I didn't have" anyone else. She testified that she and the defendant no longer talked.

¶ 13 On cross-examination, she agreed that the relationship was also beneficial because of the favoritism shown to her by the defendant and the special privileges she got. She agreed that she did not disclose the relationship on her own, and that she was surprised and "scared" when Hunter and an Illinois State Police investigator showed up at the IDOC facility to interview her. She was afraid she would get into trouble for the relationship. She testified that she had "feelings" for the defendant but testified that she did "not necessarily" want to be in a relationship with him once she was no longer incarcerated. She testified that she was not "forced" to have oral sex with the defendant, but that she could not remember whose idea it was. She agreed that when interviewed by the investigator and Hunter, she at first denied the act took place, then admitted to it. She reiterated that she was scared and did not want to get into trouble.

¶ 14 The next witness to testify was Lee Kersten, who testified that he was a jail lieutenant with the Jackson County Sheriff's Office, and had been with the office for over 18 years. His job was "like the assistant jail administrator," in that he oversaw "the daily operations of the jail and the hierarchy of things." He testified with regard to his familiarity with the camera surveillance system that was in place at the jail in April 2017, which he testified stored footage "between 15 and 18 days depending on which section of the jail the footage was being recorded from." He testified that "all the housing units have cameras in them, the hallways, the—any of the common areas have camera systems in them," but that, for privacy reasons, individual cells do not. He testified that he was able to retrieve footage from April 6 and 7, 2017, and that the surveillance system was working properly at that time. He viewed footage from between approximately 10:54 p.m. on April 6, 2017, through approximately 3:20 a.m. on April 7, 2017. In the footage, he observed the defendant, as

well as the former inmate. He copied the footage to disks, which he authenticated during direct examination.

¶ 15    The next witness to testify was Bobby Smith, who testified that he was a seargent at the Jackson County jail, and had been employed there for approximately 15 years. Like Kersten, Smith testified with regard to his familiarity with the camera surveillance system that was in place at the jail in April 2017, and that it was working properly at that time. He testified that he viewed the footage that was taken on April 6 and 7, 2017, and then he authenticated the aforementioned disks, as well as a flash drive containing relevant footage from those dates. He also testified with regard to general jail procedures, including lockdown time, in a manner consistent with the earlier testimony of Erica Hunter. As the footage thereafter was played for the jury, Smith testified that the defendant and the former inmate could be seen in the footage, and at various timemarks noted in the footage, he identified each of them for the jury. Smith was asked if the defendant was "performing checks properly" in the footage, and Smith testified that the defendant was not, because the defendant had opened a secure door—the door to the cell of the former inmate— without another officer present, which was against jail procedures and rules. Smith testified about the various places in the footage where the defendant could be seen standing, for several minutes at a time, at the cell of the former inmate, the door to which the defendant had opened. Smith thereafter identified the defendant entering the former inmate's cell and remaining inside the cell for several minutes. At no point did Smith testify as to whether sexual activity was occurring between the defendant and the former inmate in the footage. On cross-examination, he agreed that because there were no cameras in the cells, the footage did not reveal "what's happening or what isn't happening in the cell."

¶ 16    To provide some context for what the jury viewed during Smith's testimony, we briefly discuss the footage taken during the lockdown hours in question, noting that we agree with the

parties on appeal that the footage—which contains no audio—does not show conclusively whether the charged sex act took place. However, as the defendant accurately describes in his opening brief on appeal, in People's Exhibit 5A of the somewhat-grainy footage, after standing in the open doorway of the cell of the former inmate for approximately six minutes, apparently speaking with the unseen former inmate, the defendant thereafter can be seen with his back mostly to the camera, "in the doorway with the cell door open, and his right arm up and in a 45 degree angle against the outside wall for support." The defendant also accurately notes in his brief that the footage thereafter shows that the defendant leaned further into the cell so that the front of his pants was not visible, and remained in that position for a total of approximately 13 minutes, during which, at times, his "legs appear to slightly bow, his hips appear to slightly move further into the cell, and his head moves down towards the floor, then upwards outside of the cell door." However, it is also true, as the defendant asserts on appeal, that in Exhibit 5A, there is no indication of the defendant's "pants being manipulated from the front[,] nor are there any signs of tugging anywhere on his pants," and the footage does not show the defendant using either of his hands to unzip his pants, or to zip them again before he eventually walks away from the former inmate's cell, his back still to the camera. We note, however, that there are extended periods of time in the Exhibit 5A footage during which the defendant's left arm and hand are not visible and appear to be at least near the front of his pants, where the zipper of the pants would be, and where his exposed penis would have been if his pants were unzipped. We note as well that, during this time frame, when the defendant is not looking "upwards outside of the cell door," he is almost always looking nearly directly downward, whereas during the first approximately six minutes of his interaction at the open cell door, he appears to be looking straight into the cell, not at something close to him and down near the floor.

¶ 17    Following Smith's testimony, the State rested. The defendant thereafter made a motion for a directed verdict, which was denied. The defendant did not testify or present any evidence.

9

Following closing argument, the jury was instructed. Among the instructions the jury received, without objection, was Illinois Pattern Instructions, Criminal, No. 11.65E (4th ed. 2000), which informed the jury that "sexual penetration means any contact, however slight, between the sex organ or anus of any one person and the sex organ, mouth or anus of another person," as well as any "intrusion, however slight, of any part of the body of one person into the sex organ or anus of another person including but not limited to cunnilingus, fellatio or anal penetration," and that "[e]vidence of emission of semen is not required to prove sexual penetration."

¶ 18    The jury retired to deliberate at approximately 3:20 p.m. Over the course of the next several hours, the jury requested permission to view the footage and sent multiple notes indicating that the jury could not reach a unanimous verdict. In total, the jury deliberated for approximately 12 hours over 2 days, and watched the footage—in particular, Exhibit 5A—multiple times, before finding the defendant guilty. The defendant thereafter filed a motion for a new trial or for a judgment notwithstanding the verdict. Following a hearing, the defendant's motion was denied. The defendant, who faced up to 5 years in prison, was thereafter sentenced to conditional discharge for a period of 30 months and to pay fines, costs, and surcharges in the amount of $3000. He also was ordered to obtain a mental health evaluation and to successfully complete any recommended treatment. This timely appeal followed.

¶ 19                                II. ANALYSIS

¶ 20    On appeal, the defendant's sole[1] contention is that the State failed to prove, beyond a reasonable doubt, that the defendant committed custodial sexual misconduct. The defendant does

_____

[1]In his opening brief on appeal, the defendant raised a second issue, contending that the trial judge committed reversible error in the manner in which he handled the jury's request to review the jail surveillance footage; however, in his reply brief, the defendant acknowledges that recently-issued controlling precedent from the Illinois Supreme Court—*People v. Hollahan*, 2020 IL 125091, ¶¶ 24-27—renders his argument unsustainable, a point with which we agree. Accordingly, we will not further consider or discuss this issue.

not contest that two of the elements of the offense—that on or about April 6 or 7, 2017, (1) he was a correctional officer employed at the Jackson County jail, and (2) the former inmate was in the custody of the jail—were proved beyond a reasonable doubt, but claims that the final element—that he knowingly engaged in sexual penetration with the former inmate—was not adequately proved. In support of his argument, the defendant contends that the former inmate's "testimony was incredible, and there was no physical evidence, no corroborating eyewitness accounts, and no confession to support it."

¶ 21     It is axiomatic that in a criminal prosecution, the State bears the burden of proving beyond a reasonable doubt each element of each offense with which a defendant is charged. See, *e.g.*, *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime" or crimes charged. *Id.* We are mindful, as we employ this standard of review, that it is the trier of fact, not the reviewing court, that must resolve conflicts in the testimony, weigh the evidence presented to it, and draw reasonable inferences from basic facts to ultimate facts. *Id*. Accordingly, this court, as the reviewing court, "will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *Id*. at 224-25. We will not set aside a criminal conviction "unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id*. at 225. Moreover, it has been the longstanding and "firm" holding of the Illinois Supreme Court "that the testimony of a single witness, if positive and credible, is sufficient to convict," even when contradicted by a defendant. *Id*. at 228. We will not reverse a conviction simply because a defendant claims "a witness was not credible." *Id*. We recognize that the trier of fact "is not required to accept any possible explanation compatible with

11

the defendant's innocence and elevate it to the status of reasonable doubt," and that the trier of fact, having seen and heard the witnesses testify, is "in a much better position than are we to determine their credibility and the weight to be accorded their testimony." *Id.* at 229. Likewise, it is the function of the trier of fact, not the reviewing court, to resolve any discrepancies that appeared during a trial, as well as a defendant's attacks upon the character of the witnesses who testify against that defendant. *Id.* We note as well that this court has "consistently held that a complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse." *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992).

¶ 22    As noted above, in this case the defendant challenges the sufficiency of the evidence used to convict him, claiming on appeal that, *inter alia*, "the evidence in this case is so improbable and unsatisfactory [that] it creates a reasonable doubt as to [the defendant's] guilt." The defendant contends that the former inmate's "testimony that she performed oral sex on [the defendant] in the doorway of her cell with the cell door wide open, while [the defendant] stood outside the cell door with a security camera pointed directly at the cell door, visible to any other officers monitoring the security cameras, is so improbable or unsatisfactory that it defies credibility." He also notes that the former inmate initially denied to Hunter and an Illinois State Police investigator that the alleged sexual act took place, and he takes issue with the lack of physical evidence, lack of corroborating eyewitness testimony, and lack of a confession from the defendant. He claims that because Sargent did not directly witness the event, her "testimony added nothing to the State's case." He describes the video evidence as "inconclusive at best" and points out that the jury deliberated for an extensive period of time before reaching its verdict.

¶ 23    The State counters that the former inmate gave a perfectly reasonable explanation for her initial denial of the incident: that she was surprised and scared when Hunter and the investigator showed up, without prior notice to her, at the IDOC facility, and that she was afraid that she was

going to get into trouble for the incident. The State notes that although it is true that Sargent did not see the alleged sexual act take place, Sargent's testimony of what she heard, and what she saw leading up to the event, was consistent with the former inmate's testimony, and with the State's theory of the case, and thus was corroborative. The State also notes that the video evidence, although not conclusive, is completely consistent with the former inmate's testimony, and therefore is corroborative as well. The State points out that the lack of physical evidence of the encounter is not surprising in light of the fact that Hunter was not informed of the encounter until over two weeks after it occurred, which limited the State's ability to gather physical evidence and to uncover surveillance footage of possible earlier encounters. The State further points out that a large amount of circumstantial evidence was presented that corroborated the defendant's "special" relationship with the former inmate—including the undisputed evidence of his visits to her at the IDOC facility after she left the jail—all of which was consistent with the testimony of the former inmate, and could have bolstered her credibility with the jury with regard to her assertion that the sexual act occurred.

¶ 24 We agee with the State. In addition to the well-taken points made by the State above, we add that we find absurd and self-contradictory the defendant's claim that the former inmate's "testimony that she performed oral sex on [the defendant] in the doorway of her cell with the cell door wide open, while [the defendant] stood outside the cell door with a security camera pointed directly at the cell door, visible to any other officers monitoring the security cameras, is so improbable or unsatisfactory that it defies credibility." As multiple witnesses testified, the mere fact that the defendant opened the former inmate's cell door after lockdown hours, when there was no emergency and when the defendant was not accompanied by another correctional officer, was a violation of jail rules and procedures. Given the fact that this brazen violation of the rules, which went on for approximately 20 minutes in Exhibit 5A alone, was undisputably caught on camera—

13

and given the fact that there was no way for the defendant to hide from the camera the fact that he opened the cell door and kept it open for that long—a reasonable inference for the jury to draw was that the defendant understood the jail's late-night staffing, practices, and procedures well enough to believe that, during lockdown hours, he could flout jail rules with impunity; such an inference could reasonably lead to the further inference that the defendant believed he also could flout, with impunity, the rules prohibiting sexual relationships with inmates, and believed that the fact that he broke both the jail rules and the law would never be discovered. In other words, the defendant's own actions, undisputably caught on camera, eviscerate the validity of any argument that the former inmate's "testimony that she performed oral sex on [the defendant] in the doorway of her cell with the cell door wide open, while [the defendant] stood outside the cell door with a security camera pointed directly at the cell door, visible to any other officers monitoring the security cameras, is so improbable or unsatisfactory that it defies credibility." Considering all of the evidence presented in this case in the light most favorable to the prosecution (see, *e.g.*, *Siguenza-Brito*, 235 Ill. 2d at 224), we soundly reject the notion that there was anything inherently incredible about the testimony of the former inmate. There was not.

¶ 25    As explained above, the relevant question in this appeal is "whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime" or crimes charged. *Id*. As also explained above, it is the trier of fact—in this case, the jury—not the reviewing court, that is to resolve conflicts in the testimony, weigh the evidence presented to it, and draw reasonable inferences from basic facts to ultimate facts. *Id*. This court "will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *Id*. at 224-25. We will not set aside a criminal conviction "unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id*. at 225. Moreover, it has been the longstanding and "firm" holding of the Illinois Supreme Court "that the

testimony of a single witness, if positive and credible, is sufficient to convict," even when contradicted by a defendant. *Id.* at 228. We will not reverse a conviction simply because a defendant claims "a witness was not credible." *Id*. We recognize that the trier of fact "is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt," and that the trier of fact, having seen and heard the witnesses testify, is "in a much better position than are we to determine their credibility and the weight to be accorded their testimony." *Id.* at 229. Likewise, it is the function of the trier of fact, not the reviewing court, to resolve any discrepancies that appeared during a trial, as well as a defendant's attacks upon the character of the witnesses who testify against that defendant. *Id.* We note as well that this court has "consistently held that a complainant's testimony need not be unimpeached, uncontradicted, crystal clear, or perfect in order to sustain a conviction for sexual abuse." *Soler*, 228 Ill. App. 3d at 200.

¶ 26   The jury in this case was tasked with carefully weighing the credibility of the former inmate, as well as the evidence presented in support of her testimony and her version of events. Ultimately, the jury believed her. We do not believe that the evidence the jury considered, described in detail above, was so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt, and we conclude that a rational jury could have found beyond a reasonable doubt the essential elements of the crime of custodial sexual misconduct based upon the evidence presented in this case. Accordingly, we decline the defendant's invitation to usurp the jury and invalidate its verdict.

¶ 27                                      III. CONCLUSION

¶ 28   For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 29   Affirmed.